Case number five, Muzna v. Garland. Good morning, Your Honor. Mr. Thompson. Mr. Laurent. Mr. Thompson. Mr. Tolman, you may receive. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Daniel Tolman. I represent the petitioner Yves Mabuneza in these consolidated appeals. I'd like to reserve, I believe I indicated three minutes for rebuttal, and I'll go ahead and begin. Would the Court like a recitation of the facts? No, it's up to you. It's okay. It's just because of the being consolidated proceedings, I just thought it might be helpful, but if the Court is fine, I'll just proceed. Petitioner, could you just tell us where Mr. Mabuneza is today? My understanding, Your Honor, is he's currently in Rwanda. He has contacted me a couple of times from Rwanda. Couldn't really talk for very long, but he stated that he had fled the Congo right after arriving. Could I, I've got a naive question to ask, but why, what relief is available to him at this point, and why is this case not moved? Your Honor, the timely petition, if I understand the procedures correctly, that the government has in place, if the case is remanded and he is granted non-discretionary relief, then arrangements can be made to allow him to return, especially since he is in a third country. I believe that the government would issue some sort of humanitarian parole to facilitate his return to the United States, at which point he would be given the status that he ultimately receives. Okay, I'll ask the same question of Mr. Lawrence, but thank you very much. Of course, Your Honor. So the cases really involve two main arguments, each having a couple of sub-arguments. The first is that the, our first argument is that the agency incorrectly denied his application on the merits, and that has two subsections, why we believe that that was incorrect. And the second part relates to the motion to reconsider, that also has two sub-parts. Beginning with the merits of the decision regarding relief under the torture convention, first of all, as the government indicates in their brief, and I think that I did in mine as well, we are not pursuing any relief here other than deferral under the torture convention. That's the only one that was preserved through the agency process. His prior counsel had not appealed the issue of whether the underlying conviction disqualified him from withholding a removal or asylum, so we're not pursuing that right now. Our main disagreement with the agency regarding the merits of the case really turns on what is actually going to happen to Mr. Mwaneza once he returns to the Democratic Republic of Congo. At issue predominantly is Exhibit 27 at the trial level, tab G. In the record for case 20-1799, this appears at 471 to 478, and it is an article that that both sides really are relying on and reading in a different way. The immigration judge initially cited it and relied on agency case matter of JRGP, stating that it's possible the petitioner potentially could be identified as a recent deportee upon arriving in the DRC and may be detained. In our position is that that's not really what the exhibit says. The judge essentially mischaracterized the record evidence. The article in question discusses an actual set of interviews with recent deportees, as well as unofficial statements from police and other state actors. Mr. Toman, didn't the article primarily focus on deportations from Europe as opposed to the United States? And if so, if so, and given that, how can we say that the the determination was an error given that? That's a good question, Your Honor. Thank you. The issue I think that everybody's turning on regarding this article has to do with what happens to deportees. And I don't believe that the article makes a distinction suggesting that the views held by the police regarding people who have left the Congo previously was limited to those who were returning from Europe. So the issue is really what happens once he returns. And I don't think there was a distinction made in the article relating to the country of origin, rather the perception that anybody who had left the Congo and sought asylum elsewhere was perceived essentially as a traitor and would be detained. So we think that it still applies to that. And additionally, the judge or the board did not make that distinction in the decision. But the article, to pick up on what you just said, the article didn't say they would be detained. It said there were risks. Didn't even say that it's likely that they would, but it identifies risks. Your Honor, I'm trying to pull up the record here. And of course, my computer is being slow. The article actually contained a quote from a state official that I'm sorry, Your Honor. Where is this? Well, I'll get back to that, Your Honor. I apologize. I don't have it immediately in front of me. I believe that the article actually used a lot more certain language, something to the effect that we will detain people. And actually, one of the things that's discussed in the article is the been detained. But the article also states that an additional nine were going to be detained and only left because their family was able to pay a bribe or arrange for them to get out otherwise. So it really is the majority. We're talking about 15 people. That's... Would detention for questioning amount to torture? Your Honor, by itself, no. And that's another one of the issues relating to this article is the nature of the detention itself. A lot of the cases, for example, the case that the court, that the immigration judge relied on, JRGP, as well as some of the other cases that are cited by the government, matter of JE and also Abdulaye Beholder before this court, all of those address this issue of whether the conditions of detention are sufficient or can be sufficient to establish torture for purposes of deferral. The difference between those cases and the petitioner's case, however, is that those cases all involved a form of lawful detention. And as Your Honor said, for example, one of the cases in particular, matter of JE, discussed Haiti and deportees to Haiti. And it was a lawful sanction where there was a commission set up that would review the cases and set a release date. So that was a blanket procedure for anybody deported to Haiti as a result of criminal action in the United States. And the decision itself states that the government of Haiti had indicated that this was for the protection of the public and to prevent crime. So the existence of a commission that, even though the case discusses that the commission did meet that often, and in effect, this resulted in indefinite detention for some of the deportees, this is a different situation than what we have here. Because as the article indicates, the actual detention itself is unlawful. And it is based on the perception that anybody abroad or anybody who has left the Congo previously is essentially an activist, it also states that... Is it unlawful under DRC law or unlawful under international standards? Well, both, Your Honor. If the article is correct, that the reason that the police and the police state that their reason, essentially, they're suspicious of Congolese citizens and diaspora, and they believe that because actually, historically, the Congo has seen support from abroad for opposition forces and opposition movements within the Congo, that's where that perception comes from. So one of the individuals discussed in the article, I think, was somebody that was not involved in any kind of activism, and was still detained and suspected just because he had been abroad. Basically, it was assumed that he was a traitor and was taking action against the government or supporting forces that are hostile to the government. So I think it under both laws, and I apologize, I don't have a reference to the Congolese penal code or any equivalent provision, but I have not seen anywhere, any indication that this is lawful sanctions, such as in the case of matter of JE, where there isn't a commission set up, basically, to find out later on, okay, was this person involved in anything remotely appearing to be treason? There is no review process like that. And that also ties into the second issue that we have here. And that's, it's gonna bring this up in a minute about the motion for reconsideration, our issue with the statement about squalor in prison conditions, is not that the actual conditions within the jail are themselves what constitutes a torture, rather the actual detention, because it is not lawful sanctions, that is, that is what constitutes torture. And those conditions exacerbate the harm from that. So the regulation that the judge relied on, or actually, the judge relied on JRGP, like I said, which itself relied on the regulation at 1208.18.A3, which is correct in that context, because it relates to lawful sanctions. And that's not what's going on in petitioner's case, what we fear is unlawful sanctions. The second regulation, and this does actually carry into my second point on the first argument, is that the regulation at 1218.16.C3 provides that totality of circumstances should be considered in determining whether torture is more likely than not to occur. The respondent cites Rashia v. Ashcroft, indicating correctly that just the existence of torture in Sri Lanka does not show that a particular petitioner would be tortured. And he also cites Leninac v. Holder, which is essentially the same but involving Bosnia. In those cases, what came out really is that there needs to be an indication that the torture is going to be targeted at the individual. So just the mere existence of generalized practices amounting to torture isn't sufficient. But in petitioner's case, the court did not actually, the immigration and the different ways in which petitioner would be at risk and the different reasons why he would be at risk. So that was the second thing that was raised in the motion to reconsider is that our position is that the various different reasons, various, even the deferral does not require nexus, petitioner submitted evidence relating to a few different reasons why he would be targeted. And when taken in the aggregate as the regulation requires, we believe that that showed that overall, it was more likely than not, that he would be tortured for any one of those reasons, or another or a combination thereof. And your honors, I see that I'm within my rebuttal time. So conclude unless the court has further questions. Thank you, Mr. Tillman. Mr. Lorenz? Hello, may it please the court. My name is Jesse Lorenz, and I represent the Attorney General of the United States. And I'd like to address some of the arguments petitioner has raised regarding the article. I think part of the shortfall of this argument is that to constitute torture, it's not enough to say that detention is unlawful, he still has to and that the harm was specifically intended to inflict severe physical or mental pain or suffering under the regulations and act that results in an unanticipated or unintended severity of pain suffering is not torture. So that's one of the things that I will point out about that article, there's no showing that anything would be inflicted with the intentionality to cause torture. Also, again, this article is extremely limited. As Judge Saini pointed out, it only talks about returnees from Europe, it only interviews 15 people overall, and only four of them were detained. So it's hard to say that there's a systemic detention upon return. 15 people is a very low sample size. I'd also mentioned that it's his burden, it was his burden to prove cat protection. So the absence of evidence showing that these detentions are unlawful is on him essentially. I mean, that's something that he didn't prove. There's no evidence that these detentions are lawful or unlawful. But again, it's a distinction without difference because he still would have to show that he was being tortured, he was being harmed, rising to the level of torture, and that harm was specifically intended to constitute torture. But again, there's no evidence in this article that any of these four individuals who were detained were even tortured at most. They were detained for a limited period of time and then they talked about a few individuals specifically. One detainee was detained for 55 days, that was the top end. He was interrogated, written, and extortioned, but there's no discussion of any kind of physical harm or anything like that. Another man was detained for a day, and then the third person that they go into detail was detained, was interrogated for two and a half hours, then detained for three days. He claims he was fed very little, but then he was released after three days. I just don't think that's enough evidence to compel the conclusion that he would necessarily face torture. Really, there's no evidence that he'll even be detained, and then there's no evidence that he will be detained for a lengthy period of time or even evidence that he will be harmed, rising to the level of torture during this detention. This one article does not prove that for him. Again, it was his burden before the immigration judge to prove that he'd suffer harm rising to the level of torture within the meaning of the definition of torture, and now he must show record evidence compels the conclusion that he will be tortured within the meeting. I just don't think this one article can reach that very high burden, especially before this court. We have a discussion of prison conditions and the DRC. It's not enough to show that there's poor prison conditions. Again, this has to be shown that these prison conditions were set up and maintained with the specific intent to constitute torture. Again, there's no distinction in the case law or the regulations that this has to be a lawful punishment. This, I think, contemplates unlawful detentions as well. We're talking about, again, that record evidence shows that these conditions in the DRC prisons are because of understaffing, underfunding, and overcrowding, which this court has found insufficient and the board has found insufficient. It has to be maintained with the specific intent to constitute torture, and there's just nothing in the record compelling a conclusion contrary to that reached by the agency. Similarly, country conditions evidence alone does not compel the conclusion that petitioner is more than likely to face torture within the meaning of that term. Country conditions evidence indicates that conditions are poor in the DRC, but petitioner was still required to show that he has an individual or particularized risk. I mean, for the reasons I've discussed in my brief and previously in this argument, he has not shown that he has any individual or particularized risk outside of what the general population of the DRC faces. If the court doesn't have any questions about the denial of cap protection, I'm happy to discuss a motion to reconsider. I just ask you to address a couple of things. One is the question of possible rudeness. I agree with Mr. Thoman. Generally speaking, if this court were to grant the petition for review, there is a procedure under which DHS can return a person to the country, but generally speaking, it is my understanding, and I don't know, this is based on my understanding of procedures as they used to be, and I don't know if this is still the truth, but I think it is, and I apologize. I didn't look into this before the argument because I didn't know it was going to be an issue, but basically my understanding is what used to happen, and I think this is still true, is that if there is a remand and petitioner's presence is necessary for further proceedings, there will be a window to bring them back, but under those procedures, petitioner will come back into his previous condition, I guess, basically. So he was detained before he was removed. They would bring him back and detain him. Is that under some of the parole regs? I really don't know. You know, we don't deal with a lot of the detention stuff. We kind of are specifically, our office is specifically focused on asylum and withholding and removal of cap protection, so we don't really deal with that. I just know there is a procedure, but I don't, I can't really tell you exactly where that procedure is found and where the authority to do that kind of stuff is found. Do you suppose, Mr. Lorenz, that next week the Illinois Court of Appeals throws out the aggravated sexual abuse conviction for Mr. Mabeneza? Would that have any effect on this case? Well, it's hard for me to answer that question because that doesn't look like that's what happened here. In fact, there was a discussion in the record that he doesn't have an appeal anymore. He's already exhausted his appeals. Has that been resolved? I don't, I mean, I believe so. I mean, that wasn't explored in great depth on the record, but there is definitely a discussion in the transcript. There's a letter from his former criminal attorney saying that, you know, the only, you have like a collateral attack on your conviction, but it sounded like the direct appeal was exhausted. And like I said, they conceded, you know, removability on the criminal conviction. So I don't really know, that wasn't really an issue that they needed to explore before. So based on this limited record, what it sounded like from the record is that he, and like I said, I don't know this to be a hundred percent certain, but it sounded like he had exhausted his appeal and that there was nothing really else he could do. So I don't know if I can really answer that question. For the purposes of this case, his conviction is final. And, you know, they've conceded that he is in fact removable on that ground and ineligible for asylum and withholding of removal. So I hate to speculate as to what might happen. All right. If there's no further questions about cap protection, I'll move on to the motion to reconsider. The board did not abuse its discretion in denying petitioner's motion to reconsider. To prevail on such a motion, petitioner was required to identify an error of law or fact in the board's prior decision. And this is a very heavy burden that petitioner has to meet to have the board reopen a reconsidered case. Here, he couldn't do this because he just raised arguments that he could have earlier raised, but did not. And this is, and directly contrary to board precedent, which says you can't use a motion to reconsider as a vehicle to re-litigate your case or raise arguments that you previously could have raised, but did not. So because of that, the board did not abuse its discretion in denying his motion to reconsider. Does the court have any questions about that aspect of the decision? I don't believe so, counsel. Okay. If not, I'll summarize really quickly. In sum, this court should deny these consolidated petitions review. Petitioner's cap claim fails because he bases fear of harm on a series of unsupported suppositions. Specifically at bottom, petitioner did not show that even if he is arrested upon returning to the DRC, that he will suffer torture within the meeting of that term. Additionally, his motion to reconsider failed because he did not satisfy the procedural requirements for such motions. Thus, this court should deny the consolidated petition screen. Thank you. Thank you, Mr. Philman. I think your honor, first of all, just since I've only got a couple of minutes, but I did manage to pull up the article in question. And there are a couple of things. One thing is that it does state that the, um, all deportees are viewed as having been in political exile. And one official told the authorities that those who had made unfounded asylum declarations abroad would be arrested and imprisoned. Um, so that's, that's as far as the mandatory language or the likelihood of the arrest, uh, regarding the individual that respondent just discussed that had been locked up for 55 days. Uh, it's worth pointing out that this is somebody that had resources from abroad and essentially his family was able to arrange for him to get out. And he stated that that was the only way that he was able to survive the tension was because, uh, the Canadian mother of his children, uh, got the red cross to intervene and pay, uh, 17,000 euros in installments. Uh, so that's something worth noting, uh, regarding that article and regarding that individual, um, in question, uh, to answer the question about what happens if, if his criminal convictions are break or vacated, uh, I am not aware of, of whether he has any pending appeals right now, at least the direct appeal. I know that he had been trying to get post-conviction counsel for a number of years while he was still in custody, uh, in the United States, uh, should that be vacated, then we wouldn't file a motion to reopen his removal proceedings in order to apply for additional relief, which he was previously disqualified from receiving, um, regarding the, uh, the burden allocation on, on whether the detention is illegal to go back to that. Uh, the government is correct. It would be our burden to show that detention that he would be subject to is by itself illegal, but that was not the reason that the immigration judge denied the application. It was never discussed as an issue that we just didn't meet the burden. Uh, so that would be something to be taken up on remand. If the court finds, if this court finds that, uh, the detention would amount to torture, if illegal, then we can send it back for a determination by the agency of whether in fact it would be illegal. And I see that my time has expired. If the court has no more questions. I don't believe so. Thanks to both counsel and the case is taken under advisement.